FILED

MAY 2 7 2021

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE **JUDGE BARKER** |
| v. | ) | CASE NO. **5:21CR406** |
| | ) | |
| THOMAS MOX, | ) | Title 18, United States Code, |
| RYAN CASADY, | ) | Sections 1035, 1347, 1349, |
| ELIZABETH BALJAK, | ) | and 2; Title 42, United States |
| MEGHAN ILG, | ) | Code, Section 1320a- |
| | ) | 7b(b)(2)(B) |
| Defendants. | ) | |

**GENERAL ALLEGATIONS**

At all times material herein:

**Defendants and Related Entities**

1.      Defendant THOMAS MOX ("MOX") and Person 1 owned, controlled, and

operated Jen&Co Marketing, LLC ("Jen&Co"), a medical marketing company located in Grove

City, Ohio.   MOX also owned, controlled, and operated First Choice Medical Equipment, LLC

("First Choice"), a durable medical equipment company located in Grove City, Ohio.

2.      Defendant RYAN CASADY owned, controlled, and operated Comprehensive

Care Holdings, LLC ("Comprehensive Care") and Active Lifestyle Medical Supply, LLC

("Active Lifestyle"), durable medical equipment companies located in Uniontown, Ohio.

3.      Defendant ELIZABETH BALJAK was a resident of Pataskala, Ohio, and licensed

by the State of Ohio as a registered nurse and a certified nurse practitioner.

4.    Defendant MEGHAN ILG was a resident of Solon, Ohio, and licensed by the State of Ohio as a registered nurse and a certified nurse practitioner.

5.    Clinician 1 was a resident of Cleveland, Ohio, and licensed by the State of Ohio as a registered nurse and a certified nurse practitioner.

6.    Company 1 was a telemedicine company located in New York.

7.    Company 2 was a telemedicine company located in Maryland.

8.    BALJAK contracted with Company 1 and Company 2 to provide services as a certified nurse practitioner, including issuing prescriptions to patients.

9.    Royal Physician Network, LLC ("Royal Physicians") (not charged herein) was a telemedicine company located in Georgia.

10.    Clinician 1 contracted with Royal Physicians to provide services as a certified nurse practitioner, including issuing prescriptions to patients.

11.    Company 3 was a telemedicine company located in Massachusetts.

12.    ILG contracted with Company 3 to provide services as a certified nurse practitioner, including issuing prescriptions to patients.

13.    Together, Royal Physicians, Company 1, Company 2, and Company 3 are referred to herein as "the telemedicine companies."

14.    Company 4 was a lead generation company located in the province of British Colombia, Canada.

15.    Company 5 was a telemedicine company located in Georgia.

16.    Company 6 was a telemedicine company located in Georgia.

17.    Ruach Ziklag Holdings, LLC, d.b.a. KP Network, LLC ("KPN") (not charged herein), was a lead generation company located in Deerfield Beach, Florida.

2

18.     Company 7 was a medical marketing company located in the province of Panama, Panama.

19.     Company 8 was a medical marketing company located in Florida.

20.     Together, Jen&Co, Company 7, and Company 8 are referred to herein as "the medical marketing companies."

21.     In accordance with Ohio Revised Code Sections 4723.43(C) and 4723.481, an individual licensed by the State of Ohio as a certified nurse practitioner could, in collaboration with one or more physicians or podiatrists, provide preventive and primary care services, provide services for acute illnesses, and evaluate, promote patient wellness, and prescribe drugs and therapeutic devices.

### The Medicare Program

22.     The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Individuals who received Medicare benefits were referred to as Medicare beneficiaries ("beneficiaries").

23.     Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, Unites States Code, Section 24(b).

24.     Medicare was divided into four parts, which helped cover specific services: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

25.     Specifically, Medicare Part B provided coverage for medically necessary physician office services and outpatient care, including coverage for durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS"), such as off-the-shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively "braces"). OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit to an individual patient.

26.     CMS contracted with various companies to receive, adjudicate, process, and pay Part B claims, including claims for braces.   CMS also contracted with the Unified Program Integrity Contractor ("UPIC"), contractors that investigated fraud, waste, and abuse.   As part of an investigation, the UPIC could conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

27.     DMEPOS companies, physicians, and other healthcare providers that provided services and DMEPOS to Medicare beneficiaries were referred to as Medicare providers ("providers").   To participate in Medicare, providers were required to submit an application in which they agreed to abide by the policies, procedures, rules, and regulations governing reimbursement.   To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were also required to abide by all provisions of the Social Security Act, the regulations promulgated under the Social Security Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

28.     Specifically, a DMEPOS company enrolled as a provider by completing and submitting form CMS-855S.   As provided in form CMS-855S, a DMEPOS company had to meet certain requirements to obtain and retain billing privileges with Medicare, including: (1)

4

providing complete and accurate information on the form CMS-855S, with any changes to the information on the form reported within 30 days, (2) disclosing persons and/or organizations with ownership interests or managing control of the DMEPOS company; (3) abiding by applicable Medicare laws, regulations, and program instructions, including Title 42, United States Code, Section 1320a-7b(b), the federal anti-kickback statute; (4) acknowledging that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refraining from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard for their truth or falsity.

29. If Medicare approved a provider's application, Medicare assigned the provider a Medicate Provider Identification Number ("PIN" or "provider number"). A provider who was assigned a Medicare PIN and provided services and DMEPOS to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to the provider. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

30. Under Medicare Part B, claims for braces had to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury. Medicare used the term "ordering" or "referring" provider to identify the physician or certified nurse practitioner who ordered, referred, or certified a service or item, including DMEPOS, in that claim. Individuals ordering or referring these services or items were required to have the appropriate

training, qualifications, and licenses to provide such services.   A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services or items were provided, the cost of the services or items, the name and identification number of the physician or certified nurse practitioner who ordered the services or items, and the identification number of the brace provider that provided the services or items.   Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers.

31.     To be reimbursed from Medicare for braces, a submitted claim had to include accurate and thorough documentation demonstrating that the prescribed braces were medically necessary.   Medicare did not pay claims procured through kickbacks or bribes.

32.     Medicare regulations required providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnosis of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the provider.   Medicare required complete and accurate patient medical records so that Medicare could verify that the services and items were provided as described on the claim form.

33.     To receive reimbursement for a covered service from Medicare, a provider submitted a claim, either electronically or using a form (e.g., a CMS-1500 form or UB-92), containing the required information appropriately identifying, among other things, the provider, patient, and services rendered or items provided.

**Telemedicine**

34.     Telemedicine allowed providers, such as certified nurse practitioners, to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as video, internet, or telephone.

35.     The telemedicine companies hired licensed medical providers, including certified nurse practitioners, to furnish telemedicine services to patients.   Telemedicine companies typically paid nurse practitioners a fee to conduct consultations with patients.

**Beneficiary Leads**

36.     Beneficiary leads were electronic files containing the information of patients and potential patients.   Beneficiary leads were used by medical marketing companies to contact potential patients, and by telemedicine companies to evaluate patients and potential patients. Beneficiary leads came in three types depending on the detail of patient information contained therein.

37.     Raw beneficiary leads ("raw leads") were beneficiary leads that contained only basic beneficiary information, such as name, contact information, and a potential good or service in which the beneficiary may have interest.

38.     Long-form beneficiary leads ("long-form leads") were collections of beneficiary data, including beneficiary personal identifiers and medical diagnoses.   Long-form leads included all the beneficiary data needed to bill Medicare except for a DMEPOS prescription.

39.     Completed beneficiary leads ("completed leads") were long-form leads combined together with the DMEPOS prescription needed to bill Medicare.

40.     Lead generation companies, including Company 4 and KPN, prepared and caused to be prepared long-form leads for sale to others, including the medical marketing companies.

41.     MOX and Person 1, through Jen&Co, entered into sham agreements with lead generation companies, including Company 4 and KPN. These agreements purported to be for lawful raw leads when, in fact, and as MOX and Person 1 well knew, they were for long-form leads.

7

42.     The medical marketing companies purchased long-form leads from lead generation companies, and DMEPOS prescriptions from telemedicine companies.   The medical marketing companies then combined the long-form leads with the DMEPOS prescriptions to form completed leads, which they sold to durable medical equipment companies, including Comprehensive Care and First Choice.   These durable medical equipment companies then used the completed leads to bill Medicare or cause Medicare to be billed for DMEPOS that were (a) not medically necessary, (b) never requested by the recipient beneficiary, and (c) derived from kickbacks.

## COUNT 1
(Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

43.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

44.     From on or about March 2, 2018, to on or about September 9, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants THOMAS MOX, RYAN CASADY, ELIZABETH BALJAK, MEGHAN ILG, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18 United States Code, Section 24(b), that is, Medicare, and to obtain, by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of a health care benefit program, that is Medicare, in connection with the delivery of and

payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347 (Health Care Fraud).

Objects of the Conspiracy

45.    The objects of the conspiracy were to: (a) defraud Medicare; (b) obtain payment for claims to which the conspirators knew they were not entitled; (c) unlawfully enrich the conspirators; and (d) prevent detection of the conspiracy.

Manner and Means of the Conspiracy

It was part of the conspiracy that:

46.    ELIZABETH BALJAK, MEGHAN ILG, and Clinician 1, while contracted with the telemedicine companies, signed prescriptions for braces for beneficiaries regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and frequently without any contact with the beneficiary whatsoever ("fraudulent prescriptions").

47.    The telemedicine companies electronically transferred these fraudulent prescriptions to medical marketing companies, including Jen&Co, Company 7, and Company 8, which packaged them as part of the completed leads to refer to others in exchange for kickbacks and bribes.

48.    MOX and Person 1 entered into sham agreements with lead generation companies, including Company 4 and KPN, to disguise the payment of kickbacks and bribes for the referral of long-form leads to Jen&Co.

49.    MOX, CASADY, and Person 1 entered into written agreements with each other, and with others, for payment and receipt of kickbacks and bribes in exchange for the referral of

9

completed leads from Jen&Co to Comprehensive Care, First Choice, and others for the ordering and arranging of braces.

50.     MOX and CASADY invented or caused to be invented false beneficiary information, including gender, level of pain, and location of pain, when the true and accurate information was missing from long-form leads and completed lead.

<u>Acts in Furtherance of the Conspiracy</u>

51.     From on or about November 3, 2019, to on or about May 2, 2019, while employed by Company 3, ILG signed the following fraudulent prescriptions for DMEPOS and caused them to be submitted to Medicare for reimbursement:

   a.   On or about November 3, 2018, to Patient 2 for one back brace.   This prescription was false and fraudulent in that Patient 2 did not need a back brace and the diagnostic information ILG reported was false.

   b.   On or about December 21, 2018, to Patient 3, two knee braces, two suspension sleeves, two wrist braces, and one back brace.   This prescription was false and fraudulent in that there was no medical need for Patient 3 to use any braces and the diagnostic information ILG reported was false.

   c.   On or about March 1, 2019, to Patient 15, one back brace, one knee brace, one shoulder brace, and one suspension sleeve.   This prescription was false and fraudulent in that there was no medical need for Patient 15 to use any braces and the diagnostic information ILG reported was false.

   d.   On or about March 14, 2019, to Patient 16, two wrist braces.   This prescription was false and fraudulent in that there was no medical need for Patient 16 to use wrist braces.

10

e.  On or about May 2, 2019, to Patient 1 for two ankle braces, two knee braces, two suspension sleeves, one shoulder brace, and one wrist brace.  This prescription was false and fraudulent in that there was no medical need for Patient 1 to use any braces.

52.  From on or about December 5, 2018, to on or about March 15, 2019, while employed by Company 1 and/or Company 2, BALJAK signed the following fraudulent prescriptions for braces and caused them to be submitted to Medicare for reimbursement:

f.  On or about December 5, 2018, to Patient 6, for one knee brace, one suspension sleeve, and one back brace.  This prescription was false and fraudulent in that there was no medical need for Patient 6 to use any braces and the diagnostic information BALJAK reported was false.

g.  On or about December 12, 2018, to Patient 7, for two knee braces, two ankle braces, two suspension sleeves, and one back brace. This prescription was false and fraudulent in that there was no medical need for Patient 7 to use any braces.

h.  On or about March 24, 2019, to Patient 4, for two ankle braces, two knee braces, two suspension sleeves, and one back brace.  This prescription was false and fraudulent in that there was no medical need for Patient 4 to use any braces and the diagnostic information BALJAK reported was false.

i.  On or about March 15, 2019, to Patient 5, for two knee braces, two suspension sleeves, and one back brace. This prescription was false and fraudulent in that there was no medical need for Patient 5 to use any braces.

53.    From on or about October 9, 2018, to on or about December 11, 2018, while employed by Royal Physicians, Clinician 1 signed the following fraudulent prescriptions for braces and caused them to be submitted to Medicare for reimbursement:

    a.  On or about October 9, 2018, to Patient 9, for two knee braces, two wrist braces, and two suspension sleeves. This prescription was false and fraudulent in that there was no medical need for Patient 9 to use any braces.

    b.  On or about December 11, 2018, to Patient 8, for two knee braces, two wrist braces, two suspension sleeves, and one back brace. This prescription was false and fraudulent in that there was no medical need for Patient 8 to use any braces.

54.    On or about May 7, 2018, MOX, through First Choice, submitted a CMS-855S form to become a Medicare DMEPOS provider.

55.    On or about the following dates, MOX and Person 1, through Jen&Co, paid kickbacks and bribes to the following entities in the following amounts in exchange for referring long-form leads to Jen&Co:

| Approx. Date | Approx. Amount | Entity |
| --- | --- | --- |
| October 9, 2018 | $4,000 | Company 4 |
| October 25, 2018 | $35,750 | KPN |

56.    On or about the following dates, MOX and Person 1, through Jen&Co, paid kickbacks and bribes to the following entities in the following amounts in exchange for referring signed DMEPOS prescriptions to Jen&Co:

| Approx. Date | Approx. Amount | Entity |
|---|---|---|
| **October 9, 2018** | $18,240 | Company 6 |
| **January 18, 2019** | $28,350 | Company 5 |

57.     On or about the following dates, MOX, through First Choice, submitted and caused to be submitted to Medicare the following false and fraudulent claims:

| Approx. Date | Approx. Billed Amount | Patient | Prescriber |
|---|---|---|---|
| January 4, 2018 to January 8, 2018 | $5,557 | Patient 3 | ILG |
| October 16, 2018 to October 18, 2018 | $3,691 | Patient 9 | Clinician 1 |
| May 9, 2019 to May 14, 2019 | $4,940 | Patient 1 | ILG |

58.     From on or about August 27, 2018 to on or about September 9, 2019, MOX, through First Choice, billed Medicare approximately $3,526,734.48.

59.     On or about December 18, 2017, CASADY, through Comprehensive Care, submitted a CMS-855S form to become a Medicare DMEPOS provider.

60.     On or about the following dates, CASADY, through Comprehensive Care, paid kickbacks and bribes to the following entities in the following amounts in exchange for referring completed leads to Comprehensive Care:

| Approx. Date | Approx. Amount | Entity |
|---|---|---|
| July 19, 2018 | $23,750 | Jen&Co |
| December 17, 2018 | $140,500 | Company 8 |
| April 9, 2019 | $175,500 | Company 7 |

61.     On or about the following dates, CASADY, through Comprehensive Care, submitted and caused to be submitted to Medicare the following false and fraudulent claims:

13

| Approx. Date | Approx. Billed Amount | Patient | Prescriber |
|---|---|---|---|
| November 12, 2018 | $1,866 | Patient 2 | ILG |
| December 17, 2018 | $3,253 | Patient 6 | BALJAK |
| December 17, 2018 to December 19, 2018 | $5,926 | Patient 7 | BALJAK |
| December 31, 2018 to January 2, 2019 | $5,557 | Patient 8 | Clinician 1 |
| March 25, 2019 to March 26, 2019 | $4,641 | Patient 5 | BALJAK |
| April 2, 2019 to April 4, 2019 | $5,926 | Patient 4 | BALJAK |

62.     From on or about March 2, 2018, to on or about April 16, 2019, CASADY, though Comprehensive Care, billed Medicare approximately $19,373,195.97.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-4
(False Statements Relating to Health Care Matters, 18 U.S.C. § 1035(a))

The Grand Jury further charges:

63.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

64.     On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MEGHAN ILG, in a matter involving a health care benefit program, specifically Medicare, did knowingly and willfully (a) falsify, conceal, and cover up by trick, scheme, and device material facts, and (b) make and cause to be made materially false, fictitious, and fraudulent statements and representations, and made and used materially false writings and documents, knowing the same to contain any materially false, fictitious, and fraudulent statements and entities, in connection with the delivery of and payment for health care benefits, items, and services, in that ILG prepared and signed medical records and braces

14

prescriptions in which (a) ILG falsely stated that she determined through her interaction with the Medicare beneficiary that a particular course of treatment, including the prescription of braces, was reasonable and medically necessary; (b) ILG falsely stated that she administered certain diagnostic testing; (c) ILG falsely diagnosed the beneficiary with medical conditions to support the prescription of certain braces; and (d) ILG falsely attested that the information in the medical record was true, accurate, and complete, each record constituting a separate count of this Indictment:

| Count | Approx. Date | Patient | Record Containing False Statements and Concealment of Medical Facts |
|-------|-------------|---------|--------------------------------------------------------------------|
| 2 | December 21, 2018 | Patient 3 | Medical records and detailed written orders for two knee braces, two suspension sleeves, two wrist braces, and one back brace |
| 3 | March 1, 2019 | Patient 15 | Medical records and detailed written orders for one back brace, one knee brace, one shoulder brace, and one suspension sleeve |
| 4 | May 2, 2019 | Patient 1 | Medical records and detailed written orders for two ankle braces, two knee braces, two suspension sleeves, one shoulder brace, and one wrist brace |

All in violation of Title 18, United States Code, Sections 1035(a).

## COUNTS 5-8
(False Statements Relating to Health Care Matters, 18 U.S.C. § 1035(a))

The Grand Jury charges:

65.  Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

66.  On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant ELIZABETH BALJAK, in a matter involving a health care benefit program, specifically Medicare, did knowingly and willfully (a) falsify, conceal, and

cover up by trick, scheme, and device material facts, and (b) make and cause to be made materially false, fictitious, and fraudulent statements and representations, and made and used materially false writings and documents, knowing the same to contain any materially false, fictitious, and fraudulent statements and entities, in connections with the delivery of and payment for health care benefits, items, and services, in that BALJAK prepared and signed medical records and braces prescriptions in which (a) BALJAK falsely stated that she determined through her interaction with the Medicare beneficiary that a particular course of treatment, including the prescription of braces, was reasonable and medically necessary; (b) BALJAK falsely stated that she administered certain diagnostic testing; (c) BALJAK falsely diagnosed the beneficiary with medical conditions to support the prescription of certain braces; and (d) BALJAK falsely attested that the information in the medical record was true, accurate, and complete, each record constituting a separate count of this Indictment:

| Count | Approx. Date | Patient | Record Containing False Statements and Concealment of Medical Facts |
|---|---|---|---|
| 5 | March 15, 2019 | Patient 5 | Medical records and detailed written orders for two knee braces, two suspension sleeves, and one back brace |
| 6 | March 24, 2019 | Patient 4 | Medical records and detailed written orders for two ankle braces, two knee braces, two suspension sleeves, and one back brace |
| 7 | December 5, 2018 | Patient 6 | Medical records and detailed written orders for one knee brace, one suspension sleeve, and one back brace |
| 8 | December 12, 2018 | Patient 7 | Medical records and detailed written orders for two knee braces, two ankle braces, two suspension sleeves, and one back brace |

All in violation of Title 18, United States Code, Sections 1035(a).

16

**COUNTS 9-12**
(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)

The Grand Jury further charges:

67.       Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

68.       From on or about August 27, 2018, to on or about September 9, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THOMAS MOX, Person 1, and others known and unknown to the grand jury, knowingly and willfully executed, and attempted to execute, the above described scheme and artifice to defraud a federal health care benefit program, that is, Medicare, and to obtain by means of the false and fraudulent pretenses, representations, and promises, described herein, money and property owned by, and under the custody and control of Medicare, by causing false and fraudulent claims to be submitted to Medicare, in connection with the delivery of and payment for health care benefits, items and services.

69.       On or about the date below, in the Northern District of Ohio, Eastern Division, and elsewhere, MOX, Person 1, and others known and unknown to the grand jury, through First Choice, submitted and caused to be submitted to Medicare claims for medically unnecessary DMEPOS, each submission constituting a separate count of this Indictment:

| Count | Approx. Date | DMEPOS Prescribed | Approx. Billed Amount | Patient |
|---|---|---|---|---|
| 9 | January 4, 2018 to January 8, 2018 | Two knee braces, two suspension sleeves, two wrist braces, and one back brace | $5,557 | Patient 3 |
| 10 | September 9, 2018 | One back brace, one shoulder brace, one knee brace, and one suspension sleeve | $2,774 | Patient 10 |
| 11 | March 8, 2019 to | One back brace, one knee brace, one suspension sleeve, | $4,076 | Patient 15 |

| Count | Approx. Date | DMEPOS Prescribed | Approx. Billed Amount | Patient |
|-------|--------------|-------------------|-----------------------|---------|
|       | March 11, 2019 | and one shoulder brace |  |  |
| 12 | March 27, 2019 | Two wrist braces | $1,326 | Patient 16 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## **COUNTS 13-16**
(Health Care Fraud, 18 U.S.C. § 1347)

The Grand Jury further charges:

70.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

71.     From on or about March 2, 2018, to on or about April 16, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant RYAN CASADY, and others known and unknown to the grand jury, knowingly and willfully executed, and attempted to execute, the above described scheme to defraud a federal health care benefit program, that is, Medicare, and to obtain by false and fraudulent pretenses, representations, and promises, described herein, money and property owned by, and under the custody and control of Medicare, by causing false and fraudulent claims to be submitted to Medicare, in connection with the delivery of and payment for health care benefits, items and services.

72.     On or about the dates specified as to each count below, in the Northern District of Ohio, Eastern Division, and elsewhere, CASADY, and others known and unknown to the grand jury, through Comprehensive Care, submitted and caused to be submitted to Medicare claims for medically unnecessary DMEPOS, each submission constituting a separate count of this Indictment:

18

| Count | Approx. Date | DMEPOS Prescribed | Approx. Billed Amount | Patient |
|-------|--------------|-------------------|----------------------|---------|
| 13 | December 17, 2018 | One back brace, one knee brace, and one suspension sleeve | $3,253 | Patient 6 |
| 14 | December 17, 2018 to December 19, 2018 | Two knee braces, two ankle braces, two suspension sleeves, and one back brace | $5,926 | Patient 7 |
| 15 | February 27, 2019 | One knee brace and one suspension sleeve | $1,387.81 | Patient 11 |
| 16 | April 2, 2019 to April 4, 2019 | Two ankle braces, two knee braces, two suspension sleeves, and one back brace | $5,926 | Patient 4 |

All in violation of Title 18, United States Code, Section 1347.

### COUNTS 17-19
(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)

The Grand Jury further charges:

73.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

74.     From on or about March 2, 2018, to on or about April 16, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THOMAS MOX, RYAN CASADY, Person 1, and others known and unknown to the grand jury, knowingly and willfully executed, and attempted to execute, the above described scheme and artifice to defraud a federal health care benefit program, that is, Medicare, and to obtain by false and fraudulent pretenses, representations, and promises, described herein, money and property owned by, and under the custody and control of Medicare, by causing false and fraudulent claims to be submitted to Medicare, in connection with the delivery of and payment for health care benefits, items and services.

75.     On or about the dates specified as to each count below, in the Northern District of Ohio, Eastern Division, and elsewhere, THOMAS MOX, RYAN CASADY, Person 1, and others

known and unknown to the grand jury, through Comprehensive Care, submitted and caused to be

submitted to Medicare claims for DMEPOS that were derived from completed leads referred to

Comprehensive Care, by Jen&Co, in exchange for kickbacks and bribes, each submission

constituting a separate count of this Indictment:

| Count | Approx. Date | DMEPOS Prescribed | Approx. Billed Amount | Patient |
|---|---|---|---|---|
| 17 | July 6, 2018 | One back brace | $1,859.95 | Patient 12 |
| 18 | July 13, 2018 to July 17, 2018 | Two knee braces, two ankle braces, two suspension sleeves, and one back brace | $5,926 | Patient 13 |
| 19 | July 26, 2018 to July 30, 2018 | Two knee braces, two ankle braces, two suspension sleeves, and one back brace | $5,926 | Patient 14 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

### COUNTS 20-21
(Offer and Payment of Kickbacks in Connection with a Federal Health Care Program,
42 U.S.C § 1320a-7b(b)(2)(B))

The Grand Jury further charges:

76.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by

reference as though fully set forth herein.

77.     On or about the dates specified as to each count below, in the Northern District of

Ohio, Eastern Division, and elsewhere, defendant THOMAS MOX, Person 1, and others known

and unknown to the grand jury, did knowingly and willfully offer to pay, and did pay,

remunerations, directly and indirectly, overtly and overtly, in cash and in kind, that is, kickbacks

and bribes to Company 4 and Company 5, to induce Company 4 and Company 5 to purchase,

order, and arrange for, and recommend purchasing and ordering, any good and item, namely,

durable medical equipment, such as braces, for which payment was made in whole or in part

under a Federal health care program, as defined by 42 U.S.C. § 1320a-7b(f), namely, Medicare,

20

as set forth below, each payment constituting a separate count of this Indictment:

| Count | Approx. Date | Approx. Amount |
|-------|-------------|----------------|
| 20 | October 9, 2018 | Payment of $4,000 from Jen&Co to Company 4 |
| 21 | October 25, 2018 | Payment of $35,750 from Jen&Co to KPN |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(B).

### COUNTS 22-24
(Offer and Payment of Kickbacks in Connection with a Federal Health Care Program,
42 U.S.C § 1320a-7b(b)(2)(B))

The Grand Jury further charges:

78.     Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

79.     On or about the dates specified as to each count below, in the Northern District of Ohio, Eastern Division, and elsewhere, defendant RYAN CASADY, and others known and unknown to the grand jury, did knowingly and willfully offer to pay, and did pay, remunerations, directly and indirectly, overtly and overtly, in cash and in kind, that is, kickbacks and bribes to Jen&Co, Company 7, and Company 8, to induce Jen&Co, Company 7, and Company 8, to purchase, order, and arrange for, and recommend purchasing and ordering, any good and item, namely, durable medical equipment, such as braces, for which payment was made in whole or in part under a Federal health care program, as defined by 42 U.S.C. § 1320a-7b(f), namely, Medicare, as set forth below, each payment constituting a separate count of this Indictment:

| Count | Approx. Date | Approx. Amount |
|-------|-------------|----------------|
| 22 | July 19, 2018 | Payment of $23,750 from Comprehensive Care to Jen&Co |
| 23 | December 17, 2018 | Payment of $140,500 from Comprehensive Care to Company 8 |
| 24 | April 9, 2019 | Payment of $175,500 from Comprehensive Care to Company 7 |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(B).

## **FORFEITURE**

The Grand Jury further charges:

73.     For the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), the allegations of Counts 1 through 19 are incorporated herein by reference.   As a result of the foregoing offenses, Defendant THOMAS MOX, RYAN CASADY, ELIZABETH BALJAK, and MEGHAN ILG, shall forfeit to the United States any property real or personal, which constitutes or is derived from proceeds traceable to a violation of the charge set forth in Counts 1; and any property, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the violations charged in Counts 2 through 19; including, but not limited to, a money judgment in the amount of the proceeds traceable to the violations charged in Counts 1 through 19.

### Substitute Assets

If, as a result of any act or omission Defendant, any property subject to forfeiture:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been comingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

22

property of Defendant up to the value of the forfeitable property described above.

A TRUE BILL.

Original document—Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.